UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


UNITED STATES OF AMERICA                    CRIMINAL NO. 17-cr-00065

VERSUS                                      JUDGE FOOTE

DETRICK L. HAYWOOD                          MAGISTRATE JUDGE HORNSBY


**REPORT AND RECOMMENDATION**

**Introduction**

Defendant Detrick L. Haywood is charged in a two count indictment with being a felon in possession of firearms and illegal possession of a machine gun.  Before the court is Defendant's Motion to Suppress (Doc. 24).  For the reasons that follow, it is recommended that Defendant's motion be denied.

**Background Facts**

Federal DEA agents were monitoring a Title III wiretap on Rufus Jeter Thomas when they intercepted a phone call between Thomas and Defendant regarding a planned drive-by shooting.  That call was intercepted on July 18, 2016 at approximately 11:40 a.m.  Tr. 5. During that call, Defendant told Thomas that Thomas needed to come and pick up an M-16.

At approximately 12:20 p.m. on that same date, there was a drive-by shooting on West Laurel Street in Shreveport.  The agents learned that there was a shooter with an assault rifle in a dark colored vehicle that fired a large number of rounds.  The rounds hit a house and

another vehicle.  The agents suspected that the shooting was the same shooting mentioned by Defendant to Mr. Thomas during the 11:40 a.m. phone call.

At approximately 1:45 p.m. on the same date, agents intercepted another phone call between Defendant and Thomas.  Defendant described to Thomas how he (Defendant) leaned out the window of a vehicle and fired his weapon during the drive-by shooting.  Tr. 7.  There was another shooter in the front seat, according to Defendant, but that shooter's gun jammed.  Defendant said he brought the gun home with him and was going to clean and oil it for that person.  Id.  Defendant laughed as he described to Thomas the shooting and the victim's reaction to the large number of rounds being fired at him.  Id.

During the 1:45 p.m. phone call, Defendant told Thomas that he (Defendant) was going to go after some more people that night.  Id.  The agents immediately notified Shreveport Police Department's Violent Crimes Unit.  The agents also obtained from Defendant's cell phone provider an emergency GPS location on Defendant's phone.  Id. The emergency ping indicated that Defendant's phone was located at 725 Damaka Street in Shreveport.  Tr. 9.  The agents relayed that information to the police.

Two Shreveport detectives contacted patrol officer Peter Pollit and requested his assistance in apprehending Defendant.  The detectives met Pollit at a nearby Circle K and discussed the name, weight, and a general description of Defendant.

Once the police arrived at 725 Damaka, Officer Pollit cleared several vehicles and went to the side of the house.  The two detectives approached the front door.  There was a fence on the side of the house but, through a gap caused by a missing board, Pollit saw a man

in the backyard.  Pollit testified the man looked like he was bending down to pick up a weed eater or something. Tr. 19. Pollit, who had his gun drawn, asked the man whether Defendant was present.  The man "didn't skip a beat" and told Pollit that Defendant was in the house. Id.

Pollit walked to the front door where the detectives were visiting with the homeowner, Brittany Wells, who is the mother of four of Defendant's children.  The detectives had already asked Ms. Wells if Defendant was inside, and she said no.  Tr. 21.  Pollit then approached the front door and told Ms. Wells that he had just spoken with a man in her backyard who said that Defendant was in the house.  Tr. 22.  Pollit then asked Wells, "Do you mind if we come in and search?" Ms. Wells said, "That's fine." Tr. 22.  Pollit then told the detectives, who were standing further behind, that they had consent to search the house. Neither Pollit nor the detectives asked Wells to sign a written consent to search form.

The police entered the house and conducted a protective sweep to look for Defendant. After clearing a few rooms, Officer Pollit realized that the man who was in the backyard and told him that Defendant was in the house was Defendant.  Tr. 27.  Pollit then went outside and started looking for Defendant in the ditch/canal behind the house.  Officer Pollit admitted: "He doped [sic] me; he got me good."  Tr. 30.

Detective Jerry Curtis searched for Defendant in the master bedroom.  He looked inside a clothes closet and found a ballistic military vest with army camo covering.  Tr. 40. Three empty Glock pistol boxes were also in the closet.  Id.  The detective looked under the bed in the master bedroom and found two AR-15 style rifles.  Id.  One of the rifles had

recently been oiled. The military ballistic vest found in the closet, the rifles found under the bed, as well as magazine/clips, and ammunition found on the dresser in the bedroom, were seized.

At approximately 7:00 p.m. on July 18, 2016, the agents intercepted another call between Defendant and Rufus Thomas. According to the agent's testimony, Defendant said that he "hit the ditch" and ran off. Tr. 16. Defendant also told Thomas that the police had taken all of the guns. Tr. 16.

**Law and Analysis**

### A.  Defendant's Standing to Contest the Search

The Government argues that Defendant lacks standing to contest the sweep/search of Ms. Wells' residence. The Government points out that Defendant did not live at Ms. Wells' home, and it had been many years since he had lived there. Tr. 67. The Government also argues that Defendant abandoned any expectation of privacy in the residence when Defendant duped Officer Pollit in the backyard, "hit the ditch," and ran away.

Ms. Wells confirmed that Defendant did not live at her residence: "Me and him is not together. It's been a long time that he actually lived in my home." Tr. 67. She also testified that Defendant has no control or authority over her home, and he could not come and go as he pleased. Id. Wells testified that Defendant did visit her home on a regular basis to babysit her children and to work on vehicles in Ms. Wells' yard. But Defendant did not have a key to Ms. Wells' home, so he had to access the house using the key that was in the possession of Ms. Wells' oldest child.

Defendant relies on Minnesoto v. Olson, 495 U.S. 91 (1990) in support of his argument that he has standing to challenge the search. Olson held that an overnight guest in a dwelling had an expectation of privacy that society is prepared to recognize as reasonable under the Fourth Amendment. The Court noted that it had rejected in an earlier case the argument that merely being "legitimately on the premises" was sufficient to grant standing to challenge a search. Id. Minnesota v. Carter, 525 U.S. 83 (1998) (an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not); United States v. Rios-Davila, 530 Fed. Appx. 344 (5th Cir. 2013) (invited visitor at residence did not have standing to challenge search that began when officers entered backyard without probable cause).

At the time of the sweep, Defendant lived with his father, not with Ms. Wells. Defendant did not have unfettered access to Ms. Wells' home. He could not come and go as he pleased. His only connection to the house was frequently visiting the house to babysit Ms. Wells' children and to work on cars in Ms. Wells' yard. When the oldest child was home, Defendant could use one of their house keys in order to enter the house.

Based on the foregoing, the undersigned concludes that Defendant lacks standing to challenge the sweep of Ms. Wells' home. At best, Defendant was a frequent visitor to the home where he babysat children and worked on cars in the yard. Those limited connections to the home are insufficient to confer standing on Defendant.

Even if Defendant had standing to contest the sweep of the home, he lost or abandoned his rights to challenge it when he "hit the ditch" and fled the premises. Thus, this

case is different from many of the standing cases in the reported decisions. Those cases usually involve a visitor or houseguest who is present at the time of the challenged search. Defendant, on the other hand, was not present because he fled the scene. Therefore, he lacks standing.

### B. Consent to Enter Residence

Officer Pollit testified that he asked Ms. Wells if he and the detectives could enter the home and look for Defendant, and Ms. Wells agreed. Tr. 32. Ms. Wells, on the other hand, flatly denied that she gave consent to the search. She testified that an officer told her they had "probable cause because the guy in the backyard said [Defendant's] in there." Tr. 57. Ms. Wells testified that, in response, she "stepped back," and the officers entered. Id.

Once the officers entered the home to look for Defendant, Ms. Wells never protested, asked the officers to leave, or sought to limit the search in any way. She testified that instead she "walked off to try to see who was in my backyard." Tr. 58.

Ms. Wells' testimony that she did not consent to the sweep/search is not believable. She admitted that she and Defendant have four children together, and she did not want to see Defendant go to jail. Tr. 63. She denied knowing that a ballistic vest was in her clothes closet. Tr. 66. She denied knowing that magazine/clips and ammunition were located (in plain view) on her dresser in her bedroom. Id. The cell phone ping indicates that she lied when she said Defendant was not present when the officers arrived. There is no reason to doubt Officer Pollit's testimony. Accordingly, the undersigned finds that the credible

evidence admitted during the hearing establishes that Officer Pollit received oral consent

from Ms. Wells to enter her residence to look for Defendant.

### C.  Protective Sweep/Exigent Circumstances

When the federal agents obtained the emergency ping authorization in an attempt to

locate Defendant, they were acting quickly to attempt to prevent another drive-by shooting

that was expected to occur later that day.  The officers had already intercepted Title III

wiretaps confirming Defendant's involvement in a prior drive-by shooting, and the agents

had every reason to believe that Defendant would follow up on his threat to conduct another

shooting in a few hours.  The emergency ping authorization obtained by the federal agents

placed Defendant's phone (and, therefore, Defendant) at Ms. Wells' residence.

The protective sweep doctrine allows government agents, without a warrant, to

conduct a quick and limited search of premises for the safety of the agents and others present

at the scene. United States v. Brown, 230 F.Supp.3d 513, 525-527 (M.D. La. 2017) citing

United States v. Mendez, 431 F.3d 420, 428 (5th Cir. 2005).  A protective sweep of a house

is legal if (1) the government agents have a legitimate law enforcement purpose for being in

the house, (2) the sweep is supported by a reasonable, articulable suspicion that the area to

be swept harbors an individual posing a danger to those on the scene, (3) the sweep is no

more than a cursory inspection of those spaces where a person may be found, and (4) the

sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and lasts

no longer than the police are justified in remaining on the premises. Id.

Each of those factors support the police's entry into the residence to look for Defendant.  The police were acting on a tip from the DEA that Defendant had participated in a drive-by shooting and was planning to commit another drive-by shooting later that day. The ping of Defendant's phone showed that he was likely at the residence.  The police looked for Defendant in rooms, closets, and under beds.  The sweep ended when Defendant was not found in the residence.

The sweep/search is further supported by the exigent circumstances facing the officers.  Exigent circumstances generally exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained. United States v. Mendoza-Burciaga, 981 F.2d 192, 196 (5th Cir. 1992).  Exigent circumstances include a threat to the safety of the general public, hot pursuit of a suspect by police, or likelihood that a suspect will flee before an officer could obtain a warrant. Kirk v. Louisiana, 536 U.S. 635, 638 (2002).  Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry. United States v. Blount, 123 F.3d 831, 837 (5th Cir. 1997).

When the police arrived at Ms. Wells' residence, they reasonably believed that Defendant was located inside.  That information was confirmed when Officer Pollit was told by the man in the backyard (who later turned out to be Defendant) that Defendant was, in fact, inside Ms. Wells' residence.  It was critical that the police enter Ms. Wells' residence immediately in an attempt to locate Defendant, arrest him, and prevent another drive-by

shooting.  The officers faced a fluid, fast-moving situation in which their safety and the safety of the public was at great risk. The circumstances presented a prime example of a situation where the safety of law enforcement officers and the general public was immediately threatened.  Tamez v. City of San Marcos, Texas, 118 F.3d 1085, 1095 (5th Cir. 1997); United States v. Rico, 51 F.3d 495 (5th Cir. 1995).

**D.  Discovery of the Firearms and Ammunition**

During the sweep, the police discovered:

1.      A Colt M16A2 Commando machine gun and a Colt AR-15 SP1 rifle (loaded with 45 green tip cartridges) under Ms. Wells' bed;

2.      A camo covered military ballistic vest in Ms. Wells' closet;

3.      A double drum magazine containing 90 rounds of ammunition under Ms. Well's bed; and

4.      A KX drum magazine containing 60 rounds of ammunition under Ms. Wells' bed.

The "plain view" exception to the warrant requirement allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was "immediately apparent;" and (4) the police had a lawful right of access to the item. Horton v. California, 496 U.S. 128, 136-37 (1990); United States v. Rodriguez, 601 F.3d 402, 407 (5th Cir. 2010).

Here, there is no evidence regarding whether the incriminating nature of the items

seized was immediately apparent. The AR-15, drum magazines, and ammunition are not

illegal for a non-felon to possess. Generally, possession of the M16 machine gun is illegal,

unless the possessor of the rifle has complied with certain governmental requirements. Some

courts have found that the incriminating nature of a machine gun or AK-47 is immediately

apparent for the purposes of the plan view exception when the police are investigating a

homicide involving a firearm. See United States v. Lamb, 2012 WL 1156490 fn. 3 (S.D.

Ohio)(citing cases). The Fifth Circuit has found that a district court did not commit plain

error in finding that the incriminating character of an AR-15 was immediately apparent under

the plain view analysis. United States v. Montgomery, 998 F.2d 1014 (5th Cir. 1993). It is

also illegal for certain convicted felons to possess body armor. 18 U.S.C. § 931; La. R.S.

14:95.3.

The undersigned finds that the incriminating nature of an AR-15 rifle, a M16 rifle, a

ballistic vest, two very high capacity drum magazines, and many rounds of ammunition is

immediately apparent when the items are discovered by the police (a) during the

investigation of a recent drive-by shooting and a reported drive-by shooting planned for later

that day, and (b) at a residence where the suspect in the shooting was recently located. The

undersigned also finds that, in any event, the police were justified in seizing the firearms and

ammunition under these circumstances. "Common sense dictates that a firearm that could

be accessed by someone at the scene and used against officers or others should be unloaded,

and at least temporarily, kept in a safe place." United States v. Rodriguez, 601 F.3d 402, 408

(5th Cir. 2010).  In <u>Rodriguez</u>, the Fifth Circuit held that officers responding to a domestic dispute who seized a short-barrel shotgun in plain view while conducting a valid protective sweep of the residence did not violate the Fourth Amendment. When the officers seized the weapon, they were unaware that it was illegal. Yet, the Court concluded that the plain view doctrine allowed the officers to seize the weapon temporarily to secure it during their investigation.

The police had received credible information that Defendant was inside the residence. One of the detectives (Jerry Curtis, a supervisor in the homicide department) found the ballistic vest in Ms. Wells' closet while looking for Defendant.  When the detective looked under Ms. Wells' bed for Defendant, he could not see all of the way through due to the presence of the firearms. Tr. 40.  The detective then pulled the two rifles from under the bed in order to get a better look under the bed.  Under these circumstances, the seizure of the firearms, drum magazines, ballistic vest, and ammunition was reasonable so as to allow the officers to safely conduct their investigation.  <u>See</u>, <u>e.g.</u>, <u>United States v. Bishop</u>, 338 F.3d 623, 628-29 (6th Cir.2003) (holding that temporary seizure of a handgun in plain view was proper where the officer reasonably feared that leaving the gun accessible to a violent person whose whereabouts were not immediately apparent could pose a threat); <u>United States v. Timpani</u>, 665 F.2d 1, 5 n. 8 (1st Cir.1981) (noting that seizure of guns and storage in agent's vehicle was reasonable because serious crimes were under investigation and the agents' safety was at stake); <u>United States v. Malachesen</u>, 597 F.2d 1232, 1234 (8th Cir.1979)

(holding that the temporary seizure and unloading of a handgun whose incriminating nature was not immediately apparent was a "reasonable precaution to assure ... safety").

Later, when questioned by police, Ms. Wells confirmed that the guns belonged to Defendant.  Tr. 51-52; Defendant's Ex. A (ATF recorded interview of Ms. Wells on August 5, 2016, at time stamp 17:43 to18:02)("When they [the police] left, I called [Defendant] and I said the police are looking for you, and they took some guns.... He said 'I had just bought those guns.'").

In summary, exigent circumstances existed to allow the police to enter Ms. Wells' residence and conduct a protective sweep or search for Defendant.  The police were also allowed to seize the contraband that was in plain view during the course of that action.  The items seized were sufficiently incriminating with respect to the shootings, and the items posed a serious threat to the safety of the officers during the sweep, to allow their seizure.

**Conclusion**

Defendant lacks standing to challenge the sweep/search of Ms. Wells' residence. Defendant was not, at the time of the sweep, an overnight guest at the residence, and his frequent presence on the premises with the permission of Ms. Wells for the purpose of babysitting and working on cars, is not sufficient to confer standing.  In any event, Defendant was not even present during the sweep.  By fleeing, he abandoned any expectation of privacy that he may have had in the residence.

Even if Defendant has standing to contest the search, the undersigned finds that Ms. Wells granted oral consent for Officer Pollit and the detectives to enter the residence to look

for Defendant.  Ms. Wells knew that Defendant would not be located in the residence, because she knew that he had fled out the back as soon as the police arrived.  The credible evidence shows that Ms. Wells granted consent.

Even if Ms. Wells did not grant consent, the police had exigent circumstances to enter Ms. Wells' residence to attempt to locate Defendant and prevent another drive-by shooting. The exigencies were made even more immediate by the fact that a man in the backyard told Officer Pollit that Defendant was present inside the residence.  The rifle, machine gun, ballistic vest, and ammunition were discovered in plain view during a lawful sweep.

Accordingly;

**IT IS RECOMMENDED** that Defendant's **Motion to Suppress (Doc. 24)** be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

      THUS DONE AND SIGNED at Shreveport, Louisiana, this 26th day of October, 2017.

Mark L. Hornsby
U.S. Magistrate Judge